JOHN FLANAGAN administrator of HENRY FLANAGAN, deceased *v.* THE MAYOR AND COUNCIL of the CITY OF WILMINGTON.

In an action under the statute in relation to injuries or death occasioned by unlawful violence or negligence, by the administrator of a deceased person, against a municipal corporation to recover damages for his death occasioned by its negligence, if the declaration contains but one count alleging misfeasance, and he proves nonfeasance merely on the part of the corporation, he will be nonsuited; and leave to amend the declaration by the addition of another count alleging nonfeasance simply on the part of the corporation, after the argument of the motion for a nonsuit, will not be granted.

THIS was an action on the case founded on the recent

statute in relation to injuries or death occasioned by unlawful violence or negligence, the second section of which provides that "whenever death shall be occasioned by unlawful violence or negligence, and no suit be brought by the party injured to recover damages during his or her life, the widow of any such deceased person, or if there be no widow, the personal representatives may maintain an action and recover damages for the death thus occasioned. *Rev. Code Amend.* 664. John Flanagan was the father of Henry Flanagan, the deceased, who was a boy between seven and eight years of age at the time of his death in the month of July 1872, which was accidentally occasioned by his falling into a hole full of water and of the depth of seven feet where his body was found, in Eleventh Street in the city of Wilmington; and the plaintiff, his father, as his administrator, had brought the action to recover damages for it under the statute, and on the ground alleged in the declaration that the city authorities had caused the hole to be dug or made in the street, and had neglected to place any guard or fender around it, or to adopt any other means or precaution to prevent such an accident. The evidence in the case, however, was that there had been a stone quarry in that locality belonging to the owner of the land, prior to the opening of that part of Eleventh street by the city authorities, and upon which no work of grading had been done by their agents, or by their direction, except to have the centre or roadway of the street leveled in a partial degree, so as to fit it for the use of carts and wagons, with a good and safe cart way of ten or twelve feet around the hole in question. But as no houses had up to that time been built on that portion of the street, the owners of the land continued to work the quarry and blast and remove rock from it, until a few weeks previous to the accident, and until a cavity eighteen feet in length and fifteen feet in breadth, and with a depth varying from seven to ten feet had been made in it with a steep though irregular and rocky descent, particularly along the margin of it where it curved and extended nearly,

if not quite into the middle of the street, and which in a season of much rain, would fill with water up to the level of it. The accident was witnessed by no one, but the deceased with a brother and another boy, each a few years older than him, had been on that day following the horse and cart of his father who was hauling stone out Eleventh street over the Brandywine bridge, and riding back with him in the empty cart on its return trips, and the last that was seen of him by either of them, until after his death, was at a pump on their way out toward the hole, where the three had stopped for a few moments to get water, and the other two having obtained a drink before him, left him to get his, and immediately hurried on after the horse and cart which by that time had passed around and beyond the hole in question, without either of them, or his father who was walking along side of the cart, looking back for him, the inference was that in following after them and in his haste to catch up with them, he attempted when he reached it to run through the water along the edge of it, and fell into it and was drowned. His father, however, took no notice of his failure to rejoin them after that on their way out beyond the Brandywine, and made no inquiry of them about him, until they had reached the hole on their return trip, when in reply to his question " where he was," they told him they left him at the pump on their last trip out, and they supposed he had got tired of following the horse and cart, and had gone back home from there. But learning several hours afterward and after the close of his day's labor, on his return home, that he was not there, and had not been since that time, he commenced a search for him, and before night succeeded in finding and recovering his dead body from the bottom of the pond or hole not far from the cart way around the border of it, in a depth of eight feet of water. He was the youngest child of his father, and left two brothers and three sisters to survive him.

*Whiteley*, for the plaintiff in the examination of a witness, asked the question what would be the value of the

services of such a boy, who had been proved to be remarkably large, healthy, vigorous and promising in his physical constitution, from seven or eight to twenty-one years of age, to his father ?

*Harrington,* for the defendant, objected to the question, because the suit was not by the father to recover damages for a loss sustained by him as such, or for the loss of the services of the deceased as a minor and a son of his. No action lay at common law for a loss so occasioned to any oné, or at the suit of any one. None in England until the passage of Lord Campbell's Act, as it is generally called in that country, 9 and 10. *Vict. c.* 93; and none in this State, until the enactment of the statute which had already been read, in January 1866. On the contrary, the suit was by the father as the administrator of the deceased, in his representative character and capacity purely, and whatever damages he may be entitled to recover, as such, (if any thing more than mere nominal damages in any aspect which the jury might possibly view the facts of the case) could only be for the loss occasioned by the melancholy occurrence to those for whose benefit the action had been brought, and among whom the damages so recovered, after deducting the costs of the administration and of this suit on their behalf, would be distributable, his brothers and sisters equally as his heirs at law. And the mere pecuniary loss sustained by them would be the sole foundation and standard of the damages to be recovered in the action. *Blake's Admr. v. Midland Railway. Co.* 83 *E. C. L. R.* 108. *Tym's Admr. v. G. N. R. Co.* 110 *E. C. L. R.* 759. *S. C.* 116 *E. C. L. R.* 396. *Quinn v. Moore,* 15 *N. Y.* 432. *P. R. R. Co. v. Bebe and Wife,* 33 *Penn.* 318. *McIntyre v. N. Y. C. R. R. Co.* 47 *Barb.* 515. *P. R. R. Co. v. Vandever,* 36 *Penn.* 298. *Dickens v. N. C. R. R. Co.,* 23 *N. Y.* 158. 18 *Iowa* 280. 18 *Ill.* 349. 51 *Penn.* 315. 30 *N. J.* 188. *Sedw. on Dam.* 644. And no recovery could be had for prospective damages, unless they were expressly alleged in the narr. 24 *Barb.* 453, Nor could

speculative damages be allowed. *Lehman v. Brooklyn*, 29 *Barb*. 238.

*Whiteley.* Was not the true measure of the damages in such a case, the value of the life so lost, and occasioned by the negligence of the defendant? And was not that the meaning and true import of the statute? Suppose a boy of seven or eight years of age were mortally injured, but not instantly killed, on a railroad by reason of the negligence of the company or its servants, and he should bring suit therefor, and pending it, should die of the injury, under the first section of the statute the suit would survive, and his administrator on being made a party to it, might prosecute it to judgment and recovery—and in that case what would be the measure of his damages? Why, certainly as much, if not more than, the original plaintiff would have been entitled to recover in consequence of the negligence, had he survived the injury. And in such a case would not the measure of the damages be the value of his life to him? To hold that no other loss than such strictly pecuniary loss as may be sustained by the negligent sacrifice of the life of a human being, whoever may be the party entitled to sue for it, would have the effect practically to annul the statute, and to absolutely defeat the design of the legislature in enacting it. The object of it was apparent, and was not only wise, but humane and commendable, as it was intended to furnish what was much needed, an additional safeguard and security against the fatal accidents and scarcely less than fatal injuries, so frequently resulting from the negligence of others. And such a construction as had been contended for by the counsel for the defendant, was not the proper construction of it. *Shearm. & Redf. on Neg.* secs. 292, 293, 295. *P. R. R. Co. v. McCloskey's Admr.* 23 *Penn.* 526. *P. R. R. Co. v. Zebe and Wife*, 33 *Penn.* 329. *Blake's Admr. v. Midland Railway Co.* 10 *E. L. & E R.* 442. Neither at common law, nor under our statute was it necessary to allege for whose benefit the suit· was brought, or to specially al-

lege any prospective damages, in order to recover for them in such a case. He then adverted to the several statutes on the subject of the other States referred to, and to the particulars in which they differ from ours.

*Spruance*, for the defendant. If the action would lie and the plaintiff was entitled to recover, it could be nominal damages only, as it was manifest that no pecuniary loss whatever had been, or could be sustained by the personal representatives, the brothers and sisters, of the deceased. And if such was the case, it was neither the duty of counsel, or of the court to discover or devise some foundation on which any other damages can be recovered in it; for it was the fault or defect which was inherent in the statute itself, and nothing less.

The question propounded to the witness was then varied by the counsel for the plaintiff to the general inquiry what would the services of a stout, healthy boy of the age of seven or eight years until the age of twenty one years, be reasonably worth, which he was not prepared to answer, even to his own satisfaction, he said.

*Whiteley*, for the plaintiff, after reading various provisions of the charter and ordinances of the City as to the powers and duties of the proper authorities of it, in relation to opening and maintaining streets in a good and safe condition, rested his case.

*Harrington*, then moved a nonsuit. The declaration in the action contained but one count, and that was for a misfeasance alone, for it simply alleged that the city authorities mentioned, dug or caused to be dug the hole or cavity in question, and neglected for several months afterward to fill or cause it to be filled, or to erect any fence, fender or guard whatever around it, or between it and the narrow road-bed of the street to prevent accidents to persons using it; whilst the evidence which had already been adduced was direct and positive that it had not been made by their

70

authority or direction at all, but by others entirely, the owners of the land and the stone quarry which had been opened near the locality long before the eleventh street of the city had been laid out as far that place, or by private individuals working it on their account, or by their permission or direction merely. It would be observed that the city was not, even, sued for allowing it to be done by others without their authority or permission, and then neglecting to adopt any such precaution to prevent accidents resulting from it; for the averment in the count was ·one continuous and indivisible allegation both in structure and meaning, that the city authorities caused it to be dug and neglected either to have it filled up, or to erect any barrier between it and the portion of the street rendered unsafe by it. It was, therefore, an allegation of misfeasance, and not of non-feasance merely on their part, and the importance of the distinction between them, would readily be seen when we reflect that, if it had been a case of non-feasance or neglect merely, it would have been necessary for the plaintiff, not only to allege, but also to prove that the defendant had due notice or knowledge of the existence of the nuisance in time to have remedied it, or they would not have been liable for the consequences of it. If it had not been proved as alleged, that the defendants caused the hole to be dug, or that it was done by others with their consent or by their permission, was the plaintiff entitled *prima facie* to recover or had he any case to go to the jury?

But a municipal corporation was not liable for nonfeasance in a private action at the suit of an individual for a consequential loss or injury resulting from it. *Lane v. Copper*, 1 *Ld. Raym. Rep.* 646. *Whitfield v. Ld. LeDespencer*, *Cowp.* 754. *Russell v. The Men of Devon*, 2 *T. R.* 667. The duty of keeping streets in a good condition is a public duty, for the breach of which no private action will lie; and municipal corporations stand in that respect the same as townships or counties. 17 *How.* 161. 18 *N. J.* 108. 32 *N. J.* 394. 36 *N. H.* 284. 21 *Mich.* 84. 19 *Pick.*

456. *Dil. on Mun. Corp. sec.* 74. *Shearm. & Redf. on Neg. sec.* 153. 2 *Hilt. Rep.* 40. But if the deceased was not lawfully on the street, or was playing there, or attempted to run through the water or any part of it, or his accidentally falling into the hole or pond and his drowning in it, was in any degree attributable to the carelessness and negligence of his father on that occasion, the plaintiff was not entitled to recover. 29 *Barb.* 234. 21 *Wend.* 614. 4 *Allen* 283. 9 *Allen* 401. 6 *Hill* 592.

*Whiteley.* The declaration was not drawn hastily, or without due consideration, although it contained but one count, and that was for a misfeasance. The defendants were a municipal corporation created and endowed by the legislature with all the powers which they possess by delegation from it, and among them the power in regard to streets in the city as expressed in section 27 of the charter, *City Ordinances, page* 35, and in relation to which the whole power is conferred on the City Council; and that was done upon the implied condition when they accepted the grant and proceeded to avail themselves of it, that they would keep all the streets in good order and safe condition, and which imposed upon them the obligation to do that, and to see that no one dug or quarried deep and dangerous cavities into them, or did any thing else to impair, much less, to imperil the free use and enjoyment of them; and if any one did so, and they suffered them to remain unsafe for an unreasonable time, they became liable for any loss or injury occasioned by it to any person in a civil action, and it would be incumbent upon them in such a case to prove that they had not timely notice or knowledge of it. *Thayer v. Boston,* 19 *Pick.* 590. *Conrad v. Ithaca,* 16 *N. Y.* 158. *Schwingle v. Erie,* 22 *Penn.* 384. *Wendell v. Troy,* 39 *Barb.* 329. *Storrs v. Utica,* 17 *N. Y.* 105. *Chicago v. Robbins,* 2 *Blach.* 418. 37 *N. Y.* 573. *Shearm. & Redf. on Neg. sec.* 133. But a municipal corporation may be sued by an individual in a civil action for non-feasance merely, the true distinction in that respect being between a regular

municipal corporation, such as an actually incorporated city or borough, and only a *quasi* corporation, such as townships, counties, or the Levy Courts in this State are, which cannot be so sued. 37 *N. Y.* 573. 18 *N. Y.* 79. 11 *Wend.* 539. 3 *Hill* 612. 21 *Mich.* 84. 55 *Ill.* 346. 5 *Bingh.* 91. It was too late in the day to raise that question in this country, at least. There was no doubt that the deceased, though of the tender age of seven or eight years, had a lawful right to be on the street and for his amusement and pleasure to run after his father's horse and cart when loaded, as much as to ride back in it when it was unloaded and on its return. He had a right to be there; but the hole and pond of water had not a right to be there. 21 *Wend.* 615. 42 *Ill.* 355. 22 *Verm.* 213. 22 *Conn.* 591. 47 *Penn.* 300. 48 *Penn.* 218. 18 *Ill.* 349. 31 *Penn.* 358. 38 *N. Y.* 455.

*Spruance*, replied.

*Whiteley*, then asked leave of the court to amend the declaration by adding another count for nonfeasance simply.

*The Court.* The leave asked for to amend the declaration by another distinct count in addition to the one now contained in it, cannot be granted at this stage of the trial after the plaintiff has closed his testimony, and the argument on a motion for a nonsuit submitted upon it, has been heard and concluded, in accordance with the well settled practice of the court. It must, therefore, be refused. And as the only count in the declaration is for misfeasance, that is to say, for both the making of the nuisance, or the cavity and pool in question, and neglecting afterward to take the proper precautions and to adopt the proper means to protect the public right of way and use of that portion of the street against the serious danger of it, has not only not been sustained as alleged, but has already been directly negatived by the evidence in the case, the motion for a nonsuit must prevail, and is, therefore, granted. And as this disposes of the case, the court deems it unnecessary to express any opinion upon any other question which has been raised in it.