THE CITY OF CHICAGO, Appellant, v. JOHN MAJOR, Administrator of TIMOTHY MAJOR, deceased, Appellee.

### APPEAL FROM COOK.

A child, four years of age, fell into a water tank, constructed by the city, and was drowned: *Held,* That the father, as administrator, could maintain an action, under the act which gives a remedy when the death of a person is caused by the wrongful act, default or neglect of another.

The action, under this statute, is to be brought by the executor or administrator of the deceased, and is not limited to those cases where he leaves a widow.

Any money recovered by such an action is not to be treated as a part of the estate of the deceased; creditors do not get any benefit from it. It is to be distributed among those to whom the personal estate would descend, in the absence of a will, according to the statute of descents.

Orphans may have a redress under this statute where both parents are killed, and a husband for the loss of a wife.

The damages, under this act, can only be for the pecuniary loss, not for the bereavement; and the judgment be governed by their own knowledge, and experience applied to the proof, in estimating damage.

A long and unreasonable delay in repairing the tank, on the part of the city, would justify the jurors in presuming that the city had been notified of its defects, and was guilty of negligence in omitting to repair it.

It is not sufficient that such a tank is so constructed as to be safe for all such persons as ordinarily use the streets of a city.

The jurors are to judge whether the parents of the child, in such a case, were guilty of negligence; and the burden of proof is upon the plaintiff to show negligence in the defendant, as well as to acquit himself of it.

THE declaration in this case charges that Madison street, in the city of Chicago, was and is a common public highway and thoroughfare, of which the city had the care and management, and was bound to keep free and clear of, and from all obstructions and hindrances to free passage. That on the 6th day of August, 1854, before that time and since, there was, and stood upon Madison street, and opposite the entrance of another street, to wit, Franklin, a reservoir or tank, which the city had constructed for the collection of water for its uses and purposes, which reservoir was square in shape, constructed of wood, sunken to the depth of several feet below, and also elevated three feet above, the grade of Madison street, and contained water therein to the depth of seven feet. That it was the duty of the city to keep the reservoir well secured, and closed at the sides and covered at the top, for the security of persons passing thereby. Yet the said city, on the 6th day of August, and for a month previous thereto, permitted said reservoir to be, and continue to be, so defectively closed and protected on the sides thereof, and so insecurely covered, that, by reason of such insufficient covering and protection, one Timothy Major, of the age of about four years, on said 6th day of August, passing over and on Madison street, necessarily and unavoidably slipped and fell into said reservoir, and was

therein drowned. That the parents of said Timothy, he being from his age incapable of using proper caution and diligence while on the street, were exercising, at the time, proper care and diligence with respect to him and his passing over said street. That afterward, administration on the estate of Timothy Major was, in due form of law, granted to the plaintiff in this suit.

The second count of the declaration is substantially the same as the first.

The third count of the declaration is also in substance similar to the first and second counts, except that it does not allege the city constructed the tank, but that, standing on Madison street, it was the duty of the city to keep it in order. This concludes to the damage of the estate of Timothy Major five thousand dollars.

To this declaration the city of Chicago put in the plea of not guilty, and a further special plea, to the effect that the city constructed the tank in a good and substantial manner, and securely and properly covered and closed the sides of the same, and that some person, unknown to the city, and without any authority from it, without its consent and knowledge, and without its being notified to the city, tore up and removed the covering of the tank, whereby it became unsafe, as alleged ; nor was the city afterward notified of said covering being torn up or removed.

Issue was joined on the plea of not guilty, and a demurrer filed, and sustained to the second or special plea.

Afterward, on 21st of November, 1856, in the circuit court, MANIERRE, Judge, presiding, trial was had on the issue joined, and the jury returned a verdict for plaintiff, and assessed the damages at eight hundred dollars, whereupon the defendant moved for a new trial.

The court overruled the motion for a new trial and rendered judgment on the verdict of the jury. Thereupon the defendant prayed an appeal to the supreme court.

The bill of exceptions shows the following proceedings on the trial :

Hugh Glassford testified : That the tank stood near the south side of Madison, and at the termination or head of Franklin street. It was above the level of the street, and nearly level with the level of Madison street sidewalk, which it was close enough to for a person to step on from the sidewalk. The street crossings were twenty feet from the tank. It was four or five feet square ; stood partly in the gutter on the side of Madison, and, owing to the slope of the gutter, was higher above ground next the sidewalk than on the side fronting Franklin. Recollects when Major's child was drowned,

in July or August. Was a good deal on Madison street, and noticed the tank, which was considerably out of repair, sometimes with the cover off, and sometimes with boards off the side. There were boards off the side three months previously to the death of Major's child, and was a dangerous place for children. The water in it probably twenty feet deep. The tank connected with subterranean aqueducts and supplied water for fires. The day Major's child was drowned the west side of the tank was open about two feet, and had been so two or three months. Can't tell of its condition on particular days. When I went there that day the cover had been removed for Major to fish in it for the child. The side next the sidewalk was open two feet, and was a place a child could readily fall in with some exertion on its part. The top of the tank a foot above the Madison street sidewalk. Think the child four years old.

DOCTOR BOONE. Am physician and surgeon. Went to Major's house, which is two hundred feet from the tank, and made efforts to resuscitate the child, but could not restore animation. Child died from drowning. Saw the tank; it was about as Glassford states; saw it after child was taken up. It stood partly in the gutter, and ground sloped. Think a child could not get in it accidentally. Should hardly think that the ground pitched so that the child could get in without inclination or exertion of its own. Think the child could not fall in the tank from the sidewalk. A child could easily step up to the tank, whether the cover was off or on, and bend over it, if it chose. Think the child could get in at the side, where the boards were off, but hardly so without a will or effort of its own.

AUSTIN HYNES. Was coroner, and held an inquest on the child. Examined the tank at that time. Plank were off the west side, and left an opening in tank of eighteen or twenty inches at and next sidewalk; and, owing to the slope, this opening was wider at one end than the other. There was a strip of board, six or eight inches wide, across the top of the tank, under the cap, and then the opening of eighteen or twenty inches. Water in the tank not quite level with the street. The child could not fall in this opening without stooping and bending forward, on account of the cap piece of board at the top.

MRS. HAFFERT. Was standing at her door, in the alley-way between Wells and Franklin, day child was drowned. Went to the tank. Major and others were there. Lid was then turned up. Folks wanted Major to go down into the tank. He didn't seem to move quickly, and Mrs. Major wanted to jump in, but I took her home. When returning toward the

tank, met Major, having the child on his shoulder, dead, coming from the tank. Child was black and full of water. I didn't see it taken from the tank. Major's house was near the street, and the door opened directly on it. The house was two or three hundred feet from the tank. The child was a boy — its name Timothy. Tank can't be seen from my house, but could be from Major's. Did not notice condition of the tank before child was lost. Never saw the top off. The tank could be seen from Major's house. Think the child was about three years old. He was a healthy child. Major had two other children. He was a poor man and kept no servant. Both he and his wife worked for a living.

MR. FAY. When I heard the child had fallen in the tank, went out of my house, which is next door to Major's, and to the tank, in which Major, with a rope round him, was. I went to Madison street bridge to get a pole with a hook on it, and returned to the tank. Didn't see Major take the child from it, but to his house, when Dr. Boone tried to restore it. Had never before noticed the tank. Live next door to Major, and could see it from our house. The side of the tank next my house the boards were off. Mean to say, if no obstruction prevented, I could see, from my house, the side of the tank where the boards were off. Major is a sailor.

DEFENDANT'S WITNESSES. Willam Coleman: Know the tank and the occasion of Major's child being drowned. Had occasion previously to examine, and did examine it. For a considerable time there was a board off one side. The space was wider at one end than the other, because part of the tank was in the gutter, where the ground sloped off twelve to sixteen inches. The cover was on the tank every day previous to the accident. The part of the opening in the gutter end of the tank was large enough to admit a child. A child could not have fallen in without putting its head in. The widest opening in the side was from twelve to sixteen inches. The tank was four feet from the sidewalk. A child could not step from the sidewalk to the tank. Franklin street is a comparatively retired part of the city.

ELIHU GRANGER. Was an alderman when accident happened. Am familiar with these tanks. They connect with underground acqueducts to supply water for fires. I have superintended the construction of some of these tanks, which are generally alike. The depth of them, from top to bottom of the water, is about fifteen feet. In order to protect these tanks from careless or wanton injury, the common council, July 8, 1851, passed an ordinance.

The defendant then introduced section four of an ordinance

entitled, "Concerning aqueducts," passed July 8, 1851, as follows:

"Any person or persons who shall open or remove any cover or lid of any reservoir that is placed at any point on any aqueduct aforesaid, without special permission from the chief, or one of the assistant engineers of the fire department, city marshal, street commissioner, or one of the members of the common council, or except in case when an alarm of fire is given, shall forfeit and pay a penalty of five dollars for each and every offense."

The foregoing is the whole evidence given in the case.

CHARGES TO THE JURY: The counsel for the city of Chicago requested the court to charge:

"The statute of this state requiring compensation for causing death by wrongful act, neglect or default, does not embrace a a case like this, and does not authorize a verdict for the plaint iff. An action is allowed by it only in cases where the perso dying leaves a widow and next of kin."

Refused by the court, and refusal excepted to.

The counsel for the city then requested the court to give following instructions, which it did:

"A party seeking to recover damages for a loss which has been caused by negligence or misconduct, must have shown to the jury, or it must appear from the evidence, that his own negligence and misconduct, if old enough to exercise reasonable care and caution, or the negligence and misconduct of other persons, from whom care and circumspection, under the particular circumstances, should be required, has not concurred with the negligence of the party charged in producing the injury complained of.

"The burden of proof is on the plaintiff. He must show, or there must appear from the evidence, not only negligence on the part of the defendant, but that the care and circumspection demanded in relation to the party injured was properly exercised, so as to indicate that plaintiff's own negligence, if of sufficient age and experience to exercise caution, or that of those who were bound to care for the party dying, if not able to exercise it for himself, did not contribute to produce the injury complained of.

"As pertinent to the question of care on the plaintiff's part, as to the child, the jury may consider whether the deceased was of such tender years as to be likely to be inconsiderate and improvident, and, therefore, to have required, for its own safety, the control, oversight and vigilance of parents or other matured person; and if they so find, then they should inquire whether the parents or other matured person were exercising, when the death happened, a care and prudence as to the per-

23

son of the deceased, which judicious and careful parents, or persons having care of a child of like age, ought to exercise.

"The burden of proof being on the plaintiff, if the jury believe the deceased required, from his age, such prudence and care, the plaintiff must affirmatively show, or it must appear, from all the evidence in the case, that such care and circumspection were exercised at the time of the injury, or he .cannot recover.

"If the jury find the deceased was of such an age as to require the custody of his parents to insure his personal safety when in the streets, and if it appears, from the evidence, that his parents knew there was such a dangerous place in the tank, and negligently permitted the deceased to stray and wander in the streets by himself, near such tank, they did so at their own peril, and their neglect must be imputed to the infant, and no recovery can be had by the plaintiff.

"The jury, in this case, if they should find for the plaintiff, can only allow such damages as the statute authorizes. The measure of damages it adopts is simply a *compensatory* one, that is, that which will make good the loss sustained. That loss must be a pecuniary loss, and be measured by that standard, and arrived at as nearly as the circumstances will admit. The mental sufferings or grief of survivors, or loss of domestic or social happiness, or the degree of culpability of the party in fault, are not proper elements· in the calculation of damages. The jury cannot award exemplary or vindictive damages. They must ascertain from the evidence the pecuniary loss sustained, as nearly as they can approximate thereto, and make that good; and to do this, the testimony in the case must have furnished the data upon which the jury may calculate or approximate to an estimate of the pecuniary value of the life to the persons for whose benefit the plaintiff is entitled to damages. To ascertain this value of the life or the loss sustained, the jury is not entitled to go outside of the evidence and indulge in mere speculation and conjecture."

Which said ˌabove instruction the court, then and there, gave to the jury, with the addition, however, after the word "conjecture," of the following:

"Not reasonably made from the evidence, and justifiable thereby; but must found their estimate upon such facts in proof as tend to show the pecuniary extent of the loss sustained; but to enable the jury to arrive at such an estimate, it is not necessary that any witness should have expressed ·an opinion as to the amount of such pecuniary loss, but the jury may themselves make such an estimate from the facts proved, taking into consideration the age of the deceased, and such other evidence as may afford them the means of making the estimate."

To the giving of said addition to said instruction six, defendant excepted.

Counsel for defendant asked the following instruction:

"When a dangerous place is made in the street by the wrongful act of parties unknown, or without the authority of the city, the city cannot be deemed negligent until knowledge or notice of the defect is brought home to her."

Which said instruction the court then and there gave, with the addition following:

"But if a long and unreasonable delay in making such repairs shall be made to appear from the evidence, the jury may infer, or presume notice, and find for the plaintiff, as if express notice had been proved."

To the giving of which addition to instruction seven defendant excepted.

Counsel for the defendant further asked the court to give, but the court refused to give, to the jury (and for such refusal defendant excepted) the following instruction:

"If the jury believe the tank in question was reasonably safe and secure for all such persons as ordinarily make use of the streets of a city, the city is not liable for an injury resulting from its insufficiency to prevent or guard against an extraordinary occurrence or accident."

The court then, of its own motion, instructed the jury as follows:

"If the jury shall find, from the evidence, that the tank or reservoir spoken of by the witnesses was in an unsafe and insecure condition at the time of the alleged drowning, and that the same had been in such condition for three months, or any considerable period prior to that time, this is evidence from which the jury may infer negligence on the part of the defendant. And if the jury shall also find, from the evidence, that the said tank was erected by the defendant for municipal purposes, then it was the duty of the defendant to keep the same in repair. And if the jury shall find that the defendant has been guilty of such negligence in keeping the same in repair, then the plaintiff is entitled to recover, although the jury shall find that no express notice was given to the city of the unsafe condition of the tank; if they shall also find that the child, Timothy Major, was drowned therein without any negligence on the part of his parents."

To the giving of which said instruction by the court the defendant excepted.

The jury having found a verdict for the plaintiff, and assessed the damages at eight hundred dollars, the defendant moved the court for a new trial, because

1. The verdict is contrary to the law of the case.

2. The verdict is contrary to the evidence in the case.

3. The damages assessed by the jury are enormous and excessive.

4. The court refused to give the first and last instruction asked by defendant.

5. The court refused to give defendant's instructions as asked, and gave them as modified by the court.

The court overruled said motion and rendered judgment on the verdict; and to the decision of the court overruling said motion and rendering judgment, defendant excepted and prayed this appeal.

J. L. MARSH and J. L. King, for Appellant.

HERVEY and CLARKSON, for Appellee.

CATON, J. The first, and altogether the most important question here is, whether the case is within the statute, and can be maintained. The person for whose death this action is brought was a child, four years of age, and the action is brought by the father of the child, as administrator. The first section of the statute under which this action is brought, is as follows:

"That whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or company or corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony."

This is a new cause of action given by this statute, and unknown to the common law, and should not be extended beyond the fair import of the language used; but this it would be difficult to do, for the language is very broad and comprehensive, embracing, in direct and positive terms, all cases, where, if death had not ensued, the injured party could have maintained an action for the injury. This would seem to leave no room for construction, but refers us at once to the inquiry, whether an action could have been maintained by the child, for the injury, had he survived it. The act says, "then, and in every such case," the action shall be maintained. To give a further limitation than this would be, not to construe the statute, but to expunge or disregard a portion of it.

So much for the first section of the act, and the clear and

positive terms in which it is expressed, and it remains to be considered whether the legislature intended, by the provisions of the second section of the act, to create a further limitation. The second section provides that the action shall be brought in the names of the personal representatives of the deceased person, and further provides that the amount recovered " shall be for the exclusive benefit of the widow and next of kin of such deceased person, and shall be distributed to such widow and next of kin in the proportion provided by law in relation to the distribution of personal property left by persons dying intestate." This, it is contended, impliedly limits the action to cases where the person leaves a widow and next of kin ; in other words, where the deceased was, at the time of his death, a married man, for the presumption of law is, that every deceased person leaves heirs who are capable of inheriting, or next of kin. *Harvey* v. *Thornton*, 14 Ill. R. 217.

This entire act, like all others, must be read and considered together, in order to arrive at the true meaning of the legislature, but it is of primary importance to see the office which each section was designed to perform, or the particular purpose designed to be accomplished by each. In the framing of statutes, sometimes each section is designed to accomplish a distinct and independent purpose ; and sometimes the provisions of one section are intended to bear upon the subject matter of, and to control or influence the construction of another. In the former case, where each section or clause is framed for the purpose of performing a distinct and independent office, it is not intended by the legislature that it shall be controlled or qualified by another section or clause, the sole object of which was to effect a different, distinct and independent purpose. Such was evidently the case here. The sole object of the first section was to create the right of action, and to specify in what cases, or for what wrongs, it might be brought. This office, and this alone, is performed by the first section, in a clear and unambiguous manner. The purposes of the second section are two, but distinct from and entirely independent of the first section, which, so far as its object was concerned, was complete ; that is, it had created a right of action, and specified in what cases, or for what wrongs it might be brought. The two purposes, distinct from this, to accomplish which the second section was framed, were, *first,* to determine by whom or in whose name the action should be brought ; and *second,* to declare for whose benefit the action should be brought, or how the money recovered should be disposed of or distributed. The first purpose, that is, declaring by whom the action shall be brought, is declared in such a way as to leave no doubt, and to create no difficulty. The

action is to be brought by the personal representatives; that is, by the executors or administrators. But the difficulty arises out of the language used, when providing for the second object designed to be accomplished by the second section; that is, for whose benefit the suit is to be brought, or how the money recovered shall be disposed of. The expression is, that it shall be for the benefit of the widow and next of kin of the deceased, in the same proportion as is provided by law for the distribution of personal estate of intestates. Now, was it the intention of the legislature, in the use of this expression, to limit the provisions of the first section so as to afford the remedy only in those cases where the deceased left a widow? We think the sole object of this provision was to provide for the disposition of the judgment to be recovered in those cases, while the first section had already given a cause of action. The legislature intended that the money recovered should not be treated as a part of the estate of the deceased. They designed to exclude creditors from any benefit of it, and to prevent its passing by virtue of any provisions of the will of the deceased. The personal representative brings the action, not in right of the estate, but as trustee for those who had a more or less direct pecuniary interest in the continuance of the life of the deceased, and who had some claims, at least, upon his or her natural love and affection. The legislature intended that the fruits of the judgment should be distributed among those to whom his personal estate would descend, after the payment of debts, and in the absence of a will. And this intention should not be defeated because they have not used more circumlocution in defining the *cestui que trusts* who are to receive the fruits of the judgment. Had the words widow and next of kin been connected by the conjunction *or* instead of *and*, still all cases would not have been provided for according to the manifest intent of the legislature, for then the widow, where one is left, would have claimed the whole, whereas it is intended to divide it, in such a case, between the widow and next of kin, according to our statute of descents. To have expressed the full meaning of the legislature, and left nothing to implication, it would have been necessary to have added after the expression " next of kin" the words, " or, in case the deceased leaves no widow, then for the exclusive benefit of the next of kin." The courts are constantly called upon to supply, by intendment, this absence of circumlocution in acts of the legislature, in order to give effect to their manifest intention. Had it been the design of the legislature to limit the action to cases where the deceased leaves a widow, they would certainly have said so in the appropriate place, in the first section of the act, instead of giving the action in all cases where the injured

party, if death had not ensued, could have maintained an action for the injury. The words "then and in all such cases" are very emphatic, and exclude the idea of a limitation.

We can see nothing in the policy of the law which would lead to the conclusion that the legislature intended to afford no redress to orphan children, where both parents are killed, as has sometimes happened, while a remedy would have been afforded them had the father alone been killed, and the mother left to assist them. The pecuniary loss in the former case would certainly be greater to them than in the latter. Other cases of dependence and deprivation of support and maintenance, as between parent and child, or other relation, where the justice of the provisions of the act is scarcely less manifest than where the relation of husband and wife existed. But this is not all. Should we adopt the construction contended for, we should have to hold that no remedy is given to the husband for the loss of the wife. We cannot believe that the legislative mind was actuated by such narrow and limited intentions when framing the first section of the act, which alone gives the cause of action. If the cause of action is, in fact, given by the first section, which cannot, in truth, be denied, even a failure to provide for the disposition of the fruits of the judgment to be recovered could hardly be allowed to repeal any portion of the first section. If we expect to find all of the acts of the legislature perfect and harmonious, devoid of all ambiguity, or even incongruity, we shall be sadly disappointed. It is no new task imposed upon the courts to seek to find the meaning of the legislature in laws, some of the provisions of which are even inconsistent with, and contradictory to, each other. Such, however, cannot in strictness be said to be the case here. The most that can be said against this is, that it is incomplete, in the second section, in describing the beneficiaries of the judgment to be recovered, while there is neither ambiguity, uncertainty or omission in the first section, which gives the cause of action and specifies in what cases it may be maintained. In reading each section we must bear in mind its object and office, and give effect to its provisions accordingly. We think that this case was within both the language and policy of the law, and it is our duty to give effect to the intention of the legislature, thus plainly declared.

It remains briefly to examine the other instructions asked of the court, the first having been already disposed of.

The qualification to the sixth instruction presents the next ground of exception, and this, it is admitted, is technically correct, but it is objected to, as tending to mislead the jury. The rule is correctly stated that the plaintiff's damages could only be estimated for the pecuniary loss suffered by the death

of the deceased, without taking into the account the mental anguish or bereaved affections, and that the jury must make their estimate of such pecuniary damage from the facts proved, and that it was not necessary that any witness should have expressed an opinion of the amount of such pecuniary loss. In this, as in all other cases, it was proper for the jury to exercise their own judgment upon the facts in proof, by connecting them with their own knowledge and experience, which they are supposed to possess, in common with the generality of mankind. It is only where witnesses are supposed to possess a skill and judgment superior to the generality of mankind, upon a particular subject, that their opinions are allowed to go to the jury, for the purpose of supplying the supposed want of experience and judgment of the jury. Where such aids are not attainable, or are not produced, then the jury must be guided by their own best judgment, applied to the facts in proof, for the purpose of arriving at a conclusion.

The qualification given to the seventh instruction asked for the city was proper. It told the jury that they might presume notice to the city of the defect in the tank, from long and unreasonable delay in making the repairs, and find as if express notice of the defect had been proved. Ignorance of the defect for such a length of time as is here specified would be as much negligence on the part of the city as neglecting to repair after the actual notice.

The eighth instruction, which was refused, was this:

"If the jury believe that the tank in question was reasonably safe and secure for all such persons as ordinarily make use of the streets of a city, the city is not liable for an injury resulting from its insufficiency to prevent or guard against an extraordinary occurrence or accident."

This instruction was asked, and, if given, would have been understood in reference to the particular facts of this case, and would have been equivalent to instructing the jury that this child had no business in the streets, and that the city was not liable for negligently leaving the tank in such a condition as to endanger the lives of such children in the streets. Such, we apprehend, is not the law, and the court properly declined so to instruct the jury. A large majority of children living in cities depend upon the daily labor of both parents for subsistence, and these parents are unable to employ nurses, who may keep a constant and vigilant eye momentarily upon their children; and we cannot hold, as a matter of law, that every time a child, four years of age, steps into the street unattended, the mother is guilty of such negligence as would authorize every reckless or careless driver to run over and trample it down with impunity, or as would authorize the city to expose

traps and pit-falls in every corner of the streets, in which a child may be drowned or maimed. Such a rule of law ought to depopulate a city of all its laboring inhabitants. In this, as in all other cases, it must be left to the jury to determine whether the parents of the child have been guilty of negligence in suffering the child to be in the streets. On this point the court justly instructed the jury in the last instruction. The jury were there told that they must believe, from the evidence, that the defendant was guilty of negligence, which produced the injury, in not keeping the tank in repair, and also that its parents were not guilty of negligence ; and in another part of the charge they were told that the burden of proof rested on the plaintiff to show, not only negligence on the part of the city, but also that the parents were not negligent. We are satisfied that the court committed no error in its decision of the questions of law which arose on the trial.

We are also asked to reverse the judgment, because the court below refused to set aside the verdict for the reason that it is not supported by the proof. Without going into a review of the evidence, it is sufficient to say that we concur in opinion with the circuit court that the evidence is sufficient to support the verdict.

The judgment of the circuit court must be affirmed.

*Judgment affirmed.*