NOTICE
Decision filed 10/09/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190268-U

NO. 5-19-0268

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL D. KASH, as Administrator of the Estate of Billy G. Kash, Deceased, | ) ) ) | Appeal from the Circuit Court of Marion County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 11-L-59 |
| ST. MARY'S GOOD SAMARITAN, INC., ST. MARY'S HOSPITAL, DR. PRASHANT SHAH, DR. RAVI GEORGE, and DR. B. GEORGE, | ) ) ) ) | |
| Defendants | ) ) | |
| (St. Mary's Good Samaritan, Inc., St. Mary's Hospital, Estate of Dr. Prashant Shah, and Dr. B. George, Defendants-Appellees). | ) ) ) | Honorable Michael D. McHaney, Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice Welch and Justice Overstreet concurred in the judgment.

**ORDER**

¶ 1    *Held*: A settlement agreement between a decedent's heirs that resolved their dispute over the estate's assets did not include a release of any of the heirs' claims against the defendants under the Wrongful Death Act. Accordingly, the circuit court erred in granting a summary judgment in favor of the defendants based on the heirs' settlement agreement.

1

¶ 2    This case presents us with an issue of contract interpretation. The case arises from a wrongful death and survival action brought by the plaintiff, Michael D. Kash, administrator of the estate of Billy G. Kash, against the defendants, St. Mary's Good Samaritan, Inc., St. Mary's Hospital, Dr. Prashant Shah, Dr. Ravi George, and Dr. B. George. Billy's heirs are his wife, Phyllis, and his four children. Prior to the administrator filing this lawsuit, a dispute arose between Phyllis and the children concerning, among other issues, ownership of Billy's farming assets, which included land, equipment, grain, and other assets. The dispute also included allegations of misconduct on the part of Phyllis and one of the sons, Mark. Phyllis and the children ultimately settled their dispute by entering into a "Family Settlement Agreement and Mutual Release" (family settlement agreement) in which they all released their claims against each other. In addition, by signing the family settlement agreement, the children released their claims to any of the assets and income of Billy's estate. In return for the children's releases, Phyllis paid each child $50,000.

¶ 3    The administrator of Billy's estate subsequently filed the present lawsuit which included wrongful death claims on behalf of the children against the defendants. The defendants moved for summary judgment on the children's wrongful death claims, maintaining that the children released their interest in the wrongful death claims under the terms of the family settlement agreement. The circuit court agreed and entered summary judgment in favor of the defendants on the children's wrongful death claims. The administrator appeals. For the following reasons, we reverse and remand.

2

¶ 4                                    I. BACKGROUND

¶ 5     On December 2, 2009, Billy was admitted to St. Mary's Hospital for a surgical procedure. Complications from the surgery resulted in Billy's death on December 17, 2009. The administrator of Billy's estate maintains that the defendants were negligent in their care and treatment of Billy at the hospital which caused his death.

¶ 6     Billy died intestate, and his heirs included Phyllis and four adult children, Randall, Jeffrey, Mark, and Tonya (collectively referred to as "the children"). Following Billy's death, Phyllis and the children had a dispute concerning the ownership of Billy's farming assets and who would serve as the administrator of Billy's estate. As noted above, the dispute included potential claims of misconduct against one or more of the heirs. Billy's assets included farm real estate, farm equipment, grain stored from previous harvests, other inventory, accounts receivable from farming operations, contracts, and other assets. Billy also had debt obligations that included a farm line of credit, equipment loans, and other accounts and notes payable.

¶ 7     Phyllis and the children ultimately resolved their dispute by executing the family settlement agreement on May 27, 2010. The family settlement agreement, signed by Phyllis and the children, expressly stated that its purpose was to resolve "all issues between the heirs with respect to the income, assets, business, claims, receivables, causes of action, and any and all other assets of Billy G. Kash and/or the Estate of Billy G. Kash." The agreement stated that it was entered into "for value received," which included a $50,000 payment from Phyllis to each of the children in exchange for their "release of any and all claims the heirs

3

may have *against each other* with respect to Billy G. Kash and/or the Estate of Billy. G. Kash" with the only exception being any claims made pursuant to the family settlement agreement. (Emphasis added.)

¶ 8    Phyllis agreed to pay all of Billy's and the estate's outstanding debts, and the children agreed to assign to Phyllis any interest that each may have in the "income, assets, grain, machinery, equipment, vehicles, accounts receivable, notes receivable, causes of action, and any and all other assets of Billy G. Kash coming to the children by virtue of the death of Billy G. Kash and/or the Estate of Billy G. Kash." Under the agreement, the children "assigned their interest in the Estate of Billy G. Kash to Phyllis" and had "no further standing with respect to the Estate of Billy G. Kash."

¶ 9    Paragraph 20 of the family settlement agreement further provided as follows:

"[E]ach of the heirs do herewith *release and discharge each other* individually, and in any other capacity, from and against any and all manner of action, causes of action, suits, claims, contributions, subrogation, debts, dues, sums of money, accounts, accountings, reckonings, bonds, bills, contracts, controversies, agreements, promises, damages, judgments, claims, and demands whatsoever in law or in equity, whether discovered or undiscovered, whether known or unknown, which any of the heirs ever had, now have, or hereafter can, shall or may have, for, upon, or by reason of any matter arising from the beginning of the world to the date of this Settlement Agreement with respect to the income and assets of Billy G. Kash, deceased, and the Estate of Billy G. Kash. Randall Kash, Jeffrey L. Kash, Mark

4

Kash, and Tonya Hart by their signatures hereto further acknowledge they have *assigned to their mother, Phyllis J. Kash* all of their interest in the income and assets of Billy G. Kash, *all interest in causes of action relating to the death of Billy G. Kash* and all of their interest in the Estate of Billy G. Kash, and shall henceforth and forevermore claim no interest in any of the income or assets of Billy G. Kash and shall claim no interest in the income or assets of the Estate of Billy G. Kash and upon the discovery of any income and/or assets of Billy G. Kash shall assign and convey the same to Phyllis J. Kash." (Emphases added.)

¶ 10     The family settlement agreement purported to be the entire agreement between Phyllis and the children "with respect to the income, assets, and beneficial interest in the Estate of Billy G. Kash and the income, assets, and beneficial interest in the Estate of Billy G. Kash." Each of Billy's children also executed an assignment of their interests in Billy's estate to Phyllis. The assignments assigned to Phyllis all of the children's "right, title, and interest as an heir/legatee of the Estate of Billy G. Kash" and included "the personal property, cash and any real estate, or interest in real estate" that they were entitled to receive as an heir. The assignment directed that distribution payments from Billy's estate for the children's interests be made payable to Phyllis.

¶ 11     None of the defendants are parties to the family settlement agreement. In addition, the defendants did not participate in the negotiation of any of the terms of the family settlement agreement, and they were not directly or indirectly involved in the controversy between Phyllis and the children with respect to Billy's farming assets and debts. The

5

defendants provided no consideration for any of the terms of the family settlement agreement, and they are not mentioned in any of the language of the agreement.

¶ 12 On November 18, 2011, the administrator of Billy's estate filed a two-count complaint against the defendants alleging a cause of action pursuant to the Survival Act (755 ILCS 5/27-6 (West 2008)) and a cause of action pursuant to the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2008)). The initial complaint was superseded by an amended complaint that included eight counts: a survival and wrongful death action against each of the defendants.[1] The wrongful death counts included allegations that Billy was survived by his spouse and the children, "each of whom sustained substantial pecuniary injury and loss as a direct result of the death of Billy G. Kash."

¶ 13 In 2017, the defendants filed the motions for summary judgment that are the subject matter of the present appeal. The motions requested summary judgment "as to a major issue." In their motions, the defendants argued that, by signing the family settlement agreement, the children had "conveyed, extinguished, forfeited, and given up all their right to and interest in an proceeds generated" in any lawsuit against the defendants. Therefore, the defendants asked for a summary judgment with respect to the wrongful death claims the administrator brought on behalf of the children.

¶ 14 In response, the administrator argued that the children's wrongful death claims were not assets of the estate and were not encompassed within the language of the family

---

[1]Dr. Ravi George obtained summary judgment on June 19, 2013, and is not a party to this appeal. Dr. Shah died during the course of the litigation, and his estate was substituted in as a party.

6

settlement agreement. In addition, the administrator argued that the children's wrongful death claims could not be assigned to Phyllis under Illinois law.[2] The administrator argued that the family settlement agreement provided only for the release of the heirs' claims against each other, not against the defendants or any other third parties. In their reply, the defendants argued that the claims against them were assets of Billy's estate and that the children expressly released all of their claims to any assets of Billy's estate. The defendants agreed that the children could not assign their claims to Phyllis but argued that the children were free to release those claims.

¶ 15    On December 11, 2018, the circuit court heard arguments on the defendants' motions for summary judgment. The circuit court agreed with the defendants and found that the children had assigned away "all interests in causes of action relating to the death of Billy G. Kash and all of their interest in the Estate of Billy G. Kash." The court specifically referred to paragraph 20 of the family settlement agreement as the basis for its conclusion. The circuit court entered a docket entry granting the defendants' motions.

¶ 16    The administrator filed a motion for reconsideration in which he argued that the defendants cannot benefit from any release contained within the family settlement agreement where the defendants did not participate in negotiating the family settlement agreement and provided no consideration for any release of their liability. In addition, the

---

[2]The defendants agree that the children's wrongful death claims cannot be assigned to Phyllis under Illinois law. See *Town & Country Bank v. Country Mutual Insurance Co.*, 121 Ill. App. 3d 216, 218 (1984), cited by the defendants for the proposition that the children could not assign their wrongful death claims but that they were free to release their interests in the claims.

7

administrator argued that, at a minimum, there existed disputed issues of fact with respect to the intent of the signors of the family settlement agreement.

¶ 17    In support of the motion to reconsider, the administrator submitted the affidavits of two attorneys who were involved in the probate dispute between the heirs. The attorneys testified in their affidavits that the family settlement agreement was not intended to create a blanket release in favor of the defendants but was intended to resolve only the disputes between the heirs with respect to the estate's farm assets. According to the attorneys, in negotiating the family settlement agreement, there were no discussions about any causes of action against the doctors or medical providers. Instead, according to the attorneys, the intent of the family settlement agreement was to resolve and to assign only the disputes among the wife and children and the intent was not to release any claims that the children had against doctors or hospitals for actions related to Billy's medical care. One of the attorneys testified in his affidavit: "My understanding was that, as a matter of law, any Wrongful Death Act claims would not even be part of Billy Kash's probate estate, and therefore could not be considered as part of a general release in a settlement of probate issues."

¶ 18    The administrator also submitted Phyllis's affidavit in which Phyllis testified that she did not intend for the children to release any causes of action they would have against Billy's treating doctors and medical providers. Phyllis testified in her affidavit that the intent of the family settlement agreement was to resolve and to assign only the disputes among Phyllis and the children concerning "the grain and farm equipment and farm land

8

issues within the Billy Kash probate estate." She testified that "the intent never was to release any claims which the children had against doctors or hospitals for actions relating to the medical care of Billy Kash arising from his thyroid surgery, based upon the children's' [*sic*] Wrongful Death claims in a medical malpractice action." She testified, "[N]o one talked about or mentioned that we were intending that my children would be required to release their claims against these doctors and hospitals as part of the settlement in the probate case."

¶ 19    The defendants argued that the family settlement agreement was unambiguous. Therefore, the defendants argued, the circuit court should not consider the affidavits as parol evidence for interpreting the intent of the agreement.

¶ 20    On June 6, 2019, the circuit court denied the administrator's motion for reconsideration and entered a written order granting the defendants' motions for summary judgment. In the written order, the circuit court found that the family settlement agreement was clear and unambiguous and that the children "have released any right, title, and interest in Billy G. Kash's estate," including any proceeds from the present lawsuit. The circuit court made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), and the administrator now brings this interlocutory appeal of the circuit court's summary judgment order.

¶ 21                                    II. ANALYSIS

¶ 22    This case is before us on an appeal from the circuit court's order granting a partial summary judgment in favor of the defendants. A summary judgment is appropriate only

9

"if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Our review of a summary judgment is *de novo*. *Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 201 (2008). Under the *de novo* standard of review, we perform the same analysis a trial court would perform and give no deference to the judge's conclusions or specific rationale. *Bituminous Casualty Corp. v. Iles*, 2013 IL App (5th) 120485, ¶ 19.

¶ 23    Here, the defendants argued, and the circuit court agreed, that the children released their claims against the defendants under the terms of the family settlement agreement. On appeal, the children challenge the circuit court's interpretation of the release provision of the family settlement agreement. Releases are contracts and, therefore, are governed by contract law. *C.O.A.L., Inc. v. Dana Hotel, LLC*, 2017 IL App (1st) 161048, ¶ 67. As a result, the issue raised is a matter of contract interpretation. The rules for interpreting contracts are well established, with the primary goal being to give effect to the intent of the parties to the contract. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). Accordingly, in the present case, the focus of our analysis is the determination of Phyllis and the children's intent when they entered into the family settlement agreement. Their intent controls the interpretation of their agreement.

¶ 24                    (A) Ambiguous or Unambiguous Contract

¶ 25    To interpret the family settlement agreement, the first task is to determine whether the contract is ambiguous with respect to the purported release claimed by the defendants.

10

*Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002) ("Where a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous."). If no ambiguity exists in a contract, its construction is a question of law. *Highland Supply Corp. v. Illinois Power Co.*, 2012 IL App (5th) 110014, ¶ 26. However, "[w]here a court determines that a contract is ambiguous, its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended." *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991). A contract is not ambiguous simply because the parties disagree as to its meaning. *Installco, Inc.*, 336 Ill. App. 3d at 783. Instead, an ambiguous contract has language that is susceptible to more than one meaning or is obscure in meaning through indefiniteness of expression. *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988).

¶ 26    In the present case, the circuit court concluded that the family settlement agreement was unambiguous and, therefore, the court did not consider any parol evidence such as the affidavits the administrator submitted in support of his motion to reconsider. The determination of whether a contract is ambiguous is a question of law that we review *de novo*. *Installco Inc.*, 336 Ill. App. 3d at 783. We agree with the circuit court that the family settlement agreement is unambiguous. Therefore, we must construe the terms of the agreement as a matter of law and without any reference to parol evidence.

¶ 27    (B)  Intent of the Parties Established by the Unambiguous Language of the Contract

¶ 28    "A release is the abandonment of a claim to the person whom the claim exists." (Internal quotation marks omitted.) *C.O.A.L., Inc.*, 2017 IL App (1st) 161048, ¶ 67. Like

11

any other written instrument, a release must be construed in a way that carries out the intentions of the parties to the instrument. *Keeran v. Wahl Co.*, 320 Ill. App. 457, 466 (1943). The intentions of the parties to an unambiguous contract must be determined from the instrument itself. *Farm Credit Bank v. Whitlock*, 144 Ill. 2d 440, 447 (1991). Unambiguous contract terms should be given their plain and ordinary meaning, and the contract should be enforced as written. *Highland Supply Corp.*, 2012 IL App (5th) 110014, ¶ 28. The rights of the parties are limited to the terms expressed in the agreement. *International Insurance Co. v. Sargent & Lundy*, 242 Ill. App. 3d 614, 622 (1993). Also, we note that in Illinois, "[r]eleases are strictly construed against the benefitting party and must spell out the intention of the parties with great particularity." *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 614 (2007). The courts must consider the contract as a whole and not focus on isolated portions of the document. *Gallagher*, 226 Ill. 2d at 233.

¶ 29 Turning to the language of the family settlement agreement in the present case, we first note that the family settlement agreement was signed by Phyllis and the children for the stated purpose of resolving "all issues between the heirs with respect to the income, assets, business, claims, receivables, causes of action, and any and all other assets of Billy G. Kash and/or the Estate of Billy G. Kash." As we have explained, the defendants are not parties to the agreement and nothing within this language suggests that any disputes are resolved by the agreement beyond the specific disputes between the heirs. The children received a $50,000 payment from Phyllis in exchange for their "release of any and all

12

claims the heirs may have *against each other* with respect to Billy G. Kash and/or the Estate of Billy G. Kash." (Emphasis added.)

¶ 30 The children agreed to assign to Phyllis "any and all interest whatsoever that each may have in the income, assets, grain, machinery, equipment, vehicles, accounts receivable, notes receivable, causes of action, and any and all other *assets of Billy G. Kash coming to the children by virtue of the death of Billy G. Kash and/or the Estate of Billy G. Kash*." (Emphasis added.) Again, nothing within this language mentions the defendants as being released from any claims the children may have against them. The children released their claims only to the assets of and distributions from Billy's estate and any claims they may have had against Phyllis.

¶ 31 In granting the defendants' request for summary judgment, the circuit court expressly directed our attention to paragraph 20 as the basis for its ruling. Paragraph 20 of the family settlement agreement provided that each heir released and discharged "*each other* \*\*\* from \*\*\* causes of action, suits, [and] claims \*\*\* with respect to the income and assets of Billy G. Kash, deceased, and the Estate of Billy G. Kash." (Emphasis added.) Paragraph 20 further provided that, in return for $50,000, the children assigned their interest in the estate to Phyllis and released their claim to "any of the income or assets" of Billy's estate.

¶ 32 Therefore, the plain language of paragraph 20 establishes that the parties to the family settlement agreement released and discharged only their claims against "each other" and the children released their claims against the estate. There is no language in the

13

agreement that suggests that the heirs intended to release any claims against any persons or entities that were not parties to the agreement.

¶ 33 Paragraph 20 of the family settlement agreement mentions "causes of action relating to the death of Billy G. Kash" but only in the context of *assigning* the causes of action to Phyllis. But, as noted above, the defendants have conceded that wrongful death claims cannot be assigned in Illinois. This language in paragraph 20 that discusses assignments is not the equivalent of a release and cannot be a basis for summary judgment in the defendants' favor for any wrongful death claims. Nothing within the language of paragraph 20 that discusses "causes of action relating to Billy's death" suggests that the parties intended to release the defendants from liability for the children's claims under the Wrongful Death Act.

¶ 34 (C) Nature of Claims Under the Wrongful Death Act

¶ 35 We agree that, under the terms of the agreement, the children no longer have a stake or claim in any lawsuit that could be brought due to Billy's death and that, if successful, would result in funds available for estate creditors and distribution to heirs as an estate asset under the provisions of the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2008)). However, the children's claims against the defendants under the Wrongful Death Act, if successful, would not result in additional estate assets. The children's wrongful death claims are not assets of Billy's estate. The nature of wrongful death claims, therefore, is important in determining Phyllis and the children's intent in executing the family settlement agreement.

14

¶ 36 Our supreme court has explained that the Wrongful Death Act created a cause of action for pecuniary losses suffered by the deceased's spouse and next of kin by reason of the death of the injured person. *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 32. Although section 2 of the Wrongful Death Act provides that every wrongful death action shall be brought by and in the names of the "personal representatives" of the deceased, the action is filed for the "*exclusive benefit* of the surviving spouse and next of kin of such deceased person." (Emphasis added.) 740 ILCS 180/2 (West 2008). The action is not brought for the benefit of the estate. Therefore, the Illinois Supreme Court has explained that the personal representative in a wrongful death claim is "merely a nominal party to this action, effectively filing suit as a statutory trustee on behalf of the surviving spouse and next of kin, who are the true parties in interest." *Glenn v. Johnson*, 198 Ill. 2d 575, 583 (2002); see also *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 361 (1995) (statutory requirement that wrongful death action be brought by and in the name of the personal representative serves to avoid a multiplicity of suits by the next of kin, and ensures that the interests of all the beneficiaries are protected).

¶ 37 Although section 2.1 of the Wrongful Death Act refers to a wrongful death action as being an "asset of the deceased estate" (740 ILCS 180/2.1 (West 2008)), the supreme court has explained that "the legislature does not treat a wrongful-death action like other assets of the deceased's estate." *Carter*, 2012 IL 113204, ¶ 38. Generally, assets of a decedent's estate are subject to the claims of creditors and chargeable with the expenses of estate administration. *Id.* With respect to a testate estate, the estate assets are distributed in

15

accordance with the deceased's will, and in the case of an intestate estate, according to the rules of descent and distribution. *Id.* The rules of descent and distribution generally provide that an intestate estate is distributed one-half to the surviving spouse and one-half to the decedent's descendants, *per stirpes*. *Id.*

¶ 38    Funds recovered from a wrongful death action, however, are not subject to the claims of creditors and are not distributed in accordance with the decedent's will or the provisions of the Probate Act. The supreme court explained this concept as follows:

> " 'The legislature intended that the money recovered [under the Wrongful Death Act] should not be treated as a part of the estate of the deceased. They designed to exclude creditors from any benefit of it, and to prevent its passing by virtue of any provisions of the will of the deceased. The personal representative brings the action, not in right of the estate, but as trustee for those who had a more or less direct pecuniary interest in the continuance of the life of the deceased, and who had some claims, at least, upon his or her natural love and affection.' " *Id.* ¶ 40 (quoting *City of Chicago v. Major*, 18 Ill. 349, 358 (1857)).

¶ 39    The *Carter* court further explained: "Although the Wrongful Death Act has undergone various amendments during its long history, this court's observation that the 'legislature intended the money recovered should not be treated as a part of the estate of the deceased' remains true today by virtue of the Act's express directive, set forth in section 2, regarding distribution of amounts recovered under the Act." *Id.*

¶ 40    The *Carter* court elaborated on this conclusion as follows:

16

"Our analysis of the issue before this court is also informed by this court's opinion in *McDaniel v. Bullard*, 34 Ill. 2d 487 (1966). There we held that a pending action under the Wrongful Death Act does not abate upon the beneficiary's death, but is subject to the provisions of the Survival Act. *McDaniel*, 34 Ill. 2d at 490-91. Thus, under *McDaniel*, the right to receive wrongful-death benefits is an asset of the estates of the next of kin, should they die; it is not an asset of the estate of the decedent who is the subject of the wrongful-death action. *National Bank of Bloomington v. Podgorski*, 57 Ill. App. 3d 265, 267 (1978). *McDaniel* is consistent with our observation in *Major*, quoted above, that the 'personal representative brings the action, *not in right of the estate*, but as trustee for those who had a more or less direct pecuniary interest in the continuance of the life of the deceased.' (Emphasis added.) *Major*, 18 Ill. at 358." *Carter*, 2012 IL 113204, ¶ 41.

¶ 41   The Illinois Supreme Court, therefore, specifically held that "*a wrongful-death action is not a true asset of the deceased's estate*." (Emphasis added.) *Id.* ¶ 42.

¶ 42   As we explained above, the intent of Phyllis and the children is the crucial focus of our interpretation of the family settlement agreement. When we consider the language of the family settlement agreement in light of the nature of the children's wrongful death claims, it becomes plainly evident to us that Phyllis and the children did not intend to release the defendants from liability for the children's wrongful death claims by executing the family settlement agreement.

17

¶ 43 In support of their argument that the children released their interest in their wrongful death claims, the defendants cite *Bender v. Eiring*, 378 Ill. App. 3d 811 (2008). That case is distinguishable and not persuasive. In *Bender*, the Department of Children and Family Services (DCFS) obtained the custody and guardianship of a child due to the parents' failure to care for and protect the child. *Id*. at 812. The child died while she remained under the guardianship of DCFS. *Id.* Shortly after the child's death, the public guardian filed a petition for the adjudication of parental neglect in probate proceedings. *Id*. The parents then executed disclaimers in which they disclaimed their rights and interests in the child's estate. Importantly, the disclaimers stated, " 'I will, for legal purposes, be deemed by the laws of the State of Illinois as *predeceasing* my daughter \*\*\* with respect to the assets in her Estate.' " (Emphasis added.) *Id.* at 813. The circuit court, therefore, entered an order in the probate proceeding that specifically found that the parents " '*will be treated as if they both predeceased the decedent*.' " (Emphasis added.) *Id.*

¶ 44 After execution of the disclaimer, the administrator of the child's estate brought a negligence action against various defendants for various claims, including claims on behalf of the child's next of kin for wrongful death. *Id*. The circuit court granted a summary judgment with respect to the parents' claims and barred their recovery under the Wrongful Death Act. *Id*. The *Bender* court held that "the parents' disclaimers, in which they renounced any interest in the decedent's estate and were *deemed to have predeceased the decedent* with respect to the assets of her estate, apply here to bar the parents from recovering for loss of society damages." (Emphasis added.) *Id*. at 815.

18

¶ 45    Nothing in *Bender* changes our analysis with respect to Phyllis and the children's intent when they executed the family settlement agreement. There is no language within the family settlement agreement that suggests that the children should be treated as having "predeceased" Billy with respect to their claims under the Wrongful Death Act. *Bender*, therefore, offers us no guidance in ascertaining the parties' intent in the present case. In addition, we believe reliance on the *Bender* court's analysis concerning the nature of claims under the Wrongful Death Act is questionable in light of our supreme court's analysis in *Carter* as set out above.

¶ 46    Furthermore, as we explain below, regardless of the nature of claims under the Wrongful Death Act, the circumstances surrounding the execution of the releases, as well as basic principles of contract formation, also defeat the defendants' attempt to benefit from the family settlement agreement. Again, in applying these principles, our focus is exclusively on giving effect to Phyllis and the children's intent in executing the family settlement agreement.

¶ 47    (D) Circumstances Surrounding the Execution of the Family Settlement Agreement

¶ 48    Illinois courts have held that the scope and effect of a release are controlled by the intention of the parties, which " 'is discerned from the language used *and the circumstances of the transaction*.' " (Emphasis in original.) *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 838 (1995) (quoting *Carona v. Illinois Central Gulf R.R. Co.*, 203 Ill. App. 3d 947, 951 (1990)). Illinois courts consider the circumstances surrounding the document's execution as a part of the agreement, reflecting the clear intent of the signatories. *Farmers*

19

*Automobile Insurance Ass'n v. Kraemer*, 367 Ill. App. 3d 1071, 1074 (2006); see also *First Bank & Trust Co. of Illinois v. Village of Orland Hills*, 338 Ill. App. 3d 35, 46 (2003); *In re Estate of Constantine*, 305 Ill. App. 3d 256, 260 (1999).

¶ 49    The circumstances surrounding the formation of the family settlement agreement are set out in the language of the agreement itself. The circumstances centered entirely and exclusively on the dispute between Phyllis and the children with respect to farm assets and labilities. The dispute included Phyllis's claim to one-half interest in grain because she claimed ownership of one-half of the land upon which the grain was produced. She also claimed a one-half interest in the farm equipment. One of the sons, Mark Kash, claimed ownership interest in a portion of the farm equipment as well as an interest in the grain. Phyllis and the children entered into the family settlement for the specifically expressed purpose of resolving "all issues between the heirs with respect to the income, assets, business, claims, receivables, causes of action, and any and all other assets of Billy G. Kash and/or the Estate of Billy G. Kash." They did so because the dispute was causing "turmoil within the family." When we consider these circumstances leading up to the family settlement agreement, it is plainly clear that the parties to the agreement intended to settle only the disputes amongst themselves with respect to the farm assets and liabilities, not settle any claims each individual heir may have against Billy's medical providers.

¶ 50    Therefore, when we consider the circumstances surrounding the creation of the family settlement agreement, the intent of Phyllis and the children is clear; they intended

to settle only their claims against each other as they related to Billy's personal and farming assets and liabilities.

¶ 51 The children's claims under the Wrongful Death Act are not mentioned nor suggested as being encompassed within the language of the release contained within the family settlement agreement. Illinois courts restrict the language of a general release to the things or persons intended to be released and refuse to interpret generalities to defeat a valid claim not then in the minds of the parties. *Farmers Automobile Insurance Ass'n*, 367 Ill. App. 3d at 1074. A release will not "be construed to include claims not within the contemplation of the parties." *Carlile*, 271 Ill. App. 3d at 838. Also, where a release contains words of general release in addition to recitals of specific claims, the words of general release are limited to the particular claim to which reference is made. *Carona v. Illinois Central Gulf R.R. Co.*, 203 Ill. App. 3d 947, 951 (1990). Here, the specific claims mentioned in the family settlement agreement do not include the children's wrongful death claims.

¶ 52                    (E) Contract Formation Principles

¶ 53 As we explained above, releases are contracts and, therefore, are governed by contract law. *C.O.A.L., Inc.*, 2017 IL App (1st) 161048, ¶ 67. The elements of a contract are an offer, acceptance, and consideration. *BMO Harris Bank, N.A. v. Porter*, 2018 IL App (1st) 171308, ¶ 53. The defendants' attempt to defeat the children's wrongful death claims is, in essence, an attempt by the defendants to enforce a contract to which they are

neither parties nor third party beneficiaries.[3] In addition, they have provided no consideration for any benefit of the agreement.

¶ 54   Consideration is the "bargained-for exchange of promises or performances and may consist of a promise, an act or a forbearance." (Internal quotation marks omitted.) *Marque Medicos Fullerton, LLC v. Zurich American Insurance Co.*, 2017 IL App (1st) 160756, ¶ 65. Valid consideration on the part of *both parties* is one of the essential requirements for the formation of a contract. *Id.* As a contract, a valid release "must be based upon consideration which consists either of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by another." *Gavery v. McMahon & Elliott*, 283 Ill. App. 3d 484, 489 (1996).

¶ 55   Our supreme court has held that a release, like any other contract, requires consideration to be valid. *Toffenetti v. Mellor*, 323 Ill. 143, 148 (1926). The supreme court explained this requirement as follows: "A valid release must be based upon a consideration before it can be efficacious in a court of law. Where the promisor receives no benefit and *the promisee suffers no detriment* the whole transaction is in its nature a *nudum pactum*." (Emphasis added.) *Id.*; see also *White v. Village of Homewood*, 256 Ill. App. 3d 354, 356 (1993). "The right to sue is significant and cannot be released absent valuable consideration given in return." *Johnson v. Maki & Associates, Inc.*, 289 Ill. App. 3d 1023, 1027 (1997).

---

[3]In their briefs, the defendants acknowledged that they were not claiming third party beneficiary status to the family settlement agreement.

¶ 56    Here, under the terms of the family settlement agreement, the defendants suffered no detriment; the family settlement agreement includes no bargained-for exchange of performances between any of the heirs or the estate and any of the defendants. Phyllis paid the consideration to the children ($50,000 to each child) in return for their releases of claims against her and the estate. Accordingly, Phyllis suffered the detriment to obtain the releases, not the defendants. Phyllis would derive no benefit from having the children release their wrongful death claims against the defendants. This fact is important to consider in evaluating the intent of the heirs in signing the family settlement agreement. Nothing within the language of the family settlement agreement, or the circumstances surrounding its formation, suggests that Phyllis intended to represent the defendants' interest in any aspect of negotiating the terms of the agreement or in paying consideration for the release of claims against her and the assets of Billy's estate.

¶ 57    Accordingly, the defendants have no contractual rights under the family settlement agreement that they can invoke to defeat the children's wrongful death claims. See *Farmers Automobile Insurance Ass'n*, 367 Ill. App. 3d at 1076 ("Farmers was not a party to the release and gave no consideration for the release. *** If Farmers *** were discharged by the release, it would receive a windfall never intended by the parties."); *Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center*, 137 Ill. App. 3d 294, 304 (1985) (a general release of "all claims of any kind" did not release a claim for retaliatory discharge because Illinois courts refuse to interpret generalities to defeat a valid claim not then in the minds of the parties).

23

¶ 58    Here, there are no terms expressed in the agreement that operate to release any of the heirs' wrongful death claims against the defendants. We will not read a release into a contract where one is not expressly provided. *Clarendon America Insurance Co. v. 69 West Washington Management, LLC*, 374 Ill. App. 3d 580, 589 (2007) ("[W]e will not insert language into the agreement that [the parties] could easily have included."). The defendants have no contractual right under the family settlement agreement. Only Phyllis and the children have rights under the contract. Therefore, the circuit court erred in granted a summary judgment in favor of the defendants based on the terms of the family settlement agreement.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we reverse the circuit court's summary judgment on the "major issue" and remand for further proceedings.


¶ 61    Reversed; cause remanded.